### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### BOWLING GREEN DIVISION

### CASE NO.: 1:05CV-00024-M

**PEGGY S. JENKINS**                                                                           **PLAINTIFF**

**V.**

**CITY OF RUSSELLVILLE, and**
**SHIRLEE YASSNEY, individual capacity**                                   **DEFENDANTS**

### <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on motion by Defendants, the City of Russellville ("City") and

Shirlee Yassney ("Yassney"), for summary judgment. (DN 64).  The Plaintiff, Peggy S. Jenkins

("Jenkins"), has brought this action against the Defendants pursuant to  42 U.S.C. § 1983,  alleging that

the Defendants denied 1) her right to due process under the Fourteenth Amendment by terminating her

from her position as City Clerk/Treasurer without a pre-termination hearing; and 2) her substantive rights

under the Fourteenth Amendment by firing her in retaliation for lawfully pursuing  a workers'

compensation claim.  Jenkins also brings pendent state law claims against the Defendants for defamation

and the intentional infliction of emotional distress/tort of outrage.  The Defendants maintain that there are

no genuine issues of material fact and that they are entitled to judgment as a matter of law with respect to

all claims raised in Plaintiff's Complaint and First Amended Complaint.  Fully briefed, this matter stands

ripe for decision.  For the following reasons, Defendant's motion for summary judgment is **GRANTED**

in part and **DENIED** in part**.**

### I. <u>Legal Standard</u>

In order to grant a motion for summary judgment, the Court must find that the pleadings, together

with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact

and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying the portion of the record which demonstrates the absence of a genuine issue of material facts. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party themselves thereafter must produce specific facts demonstrating that a genuine issue of fact exists for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of scintilla of evidence in support of the [non-moving party's] position will be insufficient, there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477. U.S. at 252. It is against this standard that the court reviews the following facts.

## II. Facts

Peggy Jenkins began working for the City of Russellville in 1978 and became the City Clerk/Treasurer in 1979. (DN 64, Ex. A, Jenkins Dep., pp. 20-21). On January 1, 1999, the Defendant Shirley Yassney took office as the new mayor of the City. (DN 64, Ex. B, Yassney Dep., pp. 160-161). According to Jenkins, shortly after taking office, Yassney "created an atmosphere of intimidation and hostility" (DN 6, Amended Complaint, ¶ 6) by, for example, installing cameras (including one in Jenkins' office) to watch city employees while they were at work (Jenkins Dep., pp. 54-58), by telling another city official and office personnel that she wanted Jenkins terminated (Jenkins Dep., pp. 53-54, 199-202), and

by installing an eavesdropping device on the phone in Jenkins' office (Jenkins Dep., pp. 118-119).

On October 14, 2003, Jenkins fell at work and her injury resulted in her absence from work for nearly four months. (Jenkins Dep., p. 121).  Following her injury, Jenkins applied for and was granted workers' compensation benefits, but she did not receive her first check until December 2, 2003. (Id., p. 143-146).  In the interim, she directed the City payroll clerk to pay her sick-leave pay until she received her first workers' compensation check since she had accumulated 1,030 hours of sick leave while working as City Clerk. (Jenkins Dep., p. 208; Fuller Dep., p. 30). When Mayor Yassney learned of this arrangement, she ordered the payroll clerk to stop issuing Jenkins checks because she believed the arrangement was in violation of City policy.

The City of Russellville's Policies and Procedure Manual seems to contain at least three different paragraphs relating to sick leave and worker's compensation benefits.  The first paragraph is in the section entitled "Sick Leave" and it states:

"Employees shall not use sick leave for job-related injuries, except that accrued sick leave may be used until the workers' compensation insurance becomes effective. Upon receiving payment from the workers' compensation insurance company, the employee shall reimburse the city for the period during which the employee used sick leave, at which time the city shall reimburse the sick leave hours to the employee."

(DN 6, Plaintiff's Amended Complaint, Ex. 1, City of Russellville's Policies and Procedures Manual, Part VI, Paragraph C(6)).  The other paragraphs are  in the section entitled "Disability Leave due to Job-Related Injury of Illness."  The first related paragraph in this section states:

"Any employee who suffers injury or illness as a result of service connected accident or illness shall be compensated at the negotiated rate with the workers' compensation insurance company.  Employees may use up to seven (7) days accrued sick leave. After which the City of Russellville will no longer be responsible for payment to the employee due to the commencement of workers' compensation payments."

(Id., Paragraph (H)(2)).  The last relevant paragraph states:

"Employees shall not use sick leave while receiving workers compensation benefits."

(Id., Paragraph (H)(3)).

According to Plaintiff Jenkins, the day she received her first workers' compensation checks, she endorsed them and had her husband deliver them to the City. (Jenkins Dep., pp. 143-146, and Ex. 10). Yassney believed, however, that Jenkins had violated City policy by instructing a subordinate to issue her sick-leave pay beyond the seven (7) days allowed in Part VI, Paragraph H(2) of the City Policies Manual and by failing to reimburse the City for approximately $800 in accordance with Part VI, Paragraph C(6) of the Manual. Indeed, Yassney apparently told City Council members at a closed session that Jenkins had committed fraud against the City and could be arrested. (Barrett Dep., pp. 26-27, 39). Then, in early January 2004, at a meeting between Yassney, Jenkins, and City Attorney Bob Hedges, Yassney told Jenkins that her actions in relation to her sick-pay were in violation of City policy and constituted fraud, whereupon Yassney suspended Jenkins for five (5) days upon return from sick leave and told her she could be arrested or fired. At this meeting, she also gave Jenkins a bill which showed that Jenkins owed the City $849.12. ((Jenkins Dep., pp. 149-51; Yassney Dep., p. 102). Following this meeting, Jenkins filed a grievance which was reviewed by City Attorney Hedges. Hedges concluded that Jenkins' actions had violated City policy and that Mayor Yassney's actions were proper. (Hedges Dep., pp. 26-28; Jenkins Dep., pp. 158-159). Jenkins then requested a hearing before the City Council concerning her suspension, but one was never conducted. (Jenkins Dep., p. 160-161).

Unrelated to these circumstances, but during the time of Jenkins' four month leave, an accounting firm, Kem, Duguid, and Associates ("KDA"), began its audit of the City's books for the fiscal year that ended June 30, 2002. (Duguid Dep., p. 8). KDA had first audited the City's books the previous fiscal year and had then noted that they had to make an unusually high number of adjustments to the City's books and that the bookkeeping suffered from a lack of segregation of job duties among the employees in regard to

4

all cash functions.  Because the 2002 audit was the first they had conducted for the City, KDA was uncertain whether the problems that existed were related to the change in auditing firms. Thus, KDA did not express its concerns to the City at that time. (Duguid Dep., p. 46, Gentry Dep., pp. 12-13, 40-41).

During the 2003 audit, however, the firm encountered more problems, including the inability  to locate requested documentation and that no entries were made to the City's general ledger during Jenkins four-month absence. (Robbins Dep., pp. 19-20).  It appeared to the auditors that Jenkins was the only person familiar with processes and locations of specific documents. (Gentry Dep., pp. 18-20; Duguid Dep., pp. 36-38).  The auditors believed a the lack of cross-training represented a significant weakness in the operation of the Clerk's office.  (Gentry Dep., pp. 18-20; Duguid Dep., pp. 39-40).  Additionally, the auditors were again required to make a large number of adjustments for routine book entries which they believed should have been made by Jenkins during the year in the ordinary course of her duties. (Gentry Dep., pp. 20-24, Duguid Dep., pp. 63, 108). Ultimately, during a January 15, 2004 meeting, the auditors told Mayor Yassney that they did not believe that Jenkins was properly performing her duties as the City Clerk/Treasurer. (Gentry Dep., p. 23, Duguid Dep., pp. 102-103).

Following Mayor Yassney's two January meetings - one with Jenkins concerning her violation of City policy concerning sick leave and workers' compensation and one with the auditors -  Yassney asked City Attorney Hedges to research a mayor's power to fire a city clerk. Hedges submitted his opinion on February 12, 2004, concluding that a mayor's decision on personnel matters was not subject to approval or override by a city council. (Hedges Dep., pp. 35-36).  On February 19, 2004, Yassney issued Jenkins a written reprimand alleging poor work performance. (Jenkins Dep., pp. 162-168).  On February 20, 2004, Yassney conducted a meeting with both Jenkins and City Attorney Hedges in which Yassney informed Jenkins that she had a choice to resign, retire,  or be terminated  for poor job performance. (Yassney Dep.,

5

p. 117, 125; Hedges Dep., pp. 41-43; Jenkins Dep., p. 162).  According to Jenkins, Yassney again told Jenkins that she could have her arrested for workers' compensation fraud. (Jenkins, pp. 162-168). According to Yassney, she also told Jenkins at this meeting that she could return with an attorney within seven (7) days to advise Yassney of her decision. (Yassney Dep., p. 118). Jenkins disputes that she was told she could/should seek an attorney at this time. (Jenkins Dep., p. 174).

Jenkins next met with Mayor Yassney on March 2, 2004. Jenkins' husband and City Attorney Hedges were also present. (Jenkins Dep., p. 174, Yassney Dep., pp. 122-23, Hedges Dep., p. 43-46). According to Yassney, Jenkins stated that her husband would be acting her attorney at the meeting. (Yassney Dep., p. 123).  When Jenkins announced that she refused to retire or resign, Yassney advised her that her employment was being terminated. (Jenkins Dep., p. 170, Yassney Dep., p. 125; Hedges Dep., pp. 46-47).

On March 11, Jenkins attended a City Council meeting and requested an investigation into her termination. (Jenkins Dep., p. 187-189).  At this meeting, she presented evidence that she reimbursed the City for her sick-pay when she began receiving workers' compensation.(Id.) The City decided to conduct an investigation and hired an attorney from Bowling Green to conduct the investigation. (Yassney Dep., p. 128).   The attorney concluded that Mayor Yassney had violated Part III, Paragraph E(3)(d)(4) of the City's Policies and Procedures by failing to provide Jenkins with a pre-termination hearing, even though one was explicitly requested by Jenkins. (DN 6, Amended Complaint, Ex. 6). Accordingly, on May 4, 2004, the City Council voted to provide Jenkins a pre-termination hearing. (Yassney Dep., p. 135).  On May 5, 2004 City Attorney Hedges wrote a letter to Plaintiff advising her of a scheduled pre-termination hearing on May 10, 2004. (Jenkins Dep., pp. 188-196.) However, Jenkins contends that she did not receive that letter until May 11, 2004. (Id.). Thus, even though Plaintiff received a phone call from a City Council

member advising her of the hearing on May 10, Jenkins declined to attend because he believed she was given insufficient notice and had no time to hire a lawyer and prepare her case. (Id.).  On May 10, 2004, the City Council met, but no vote was taken regarding the Mayor's decision to terminate Jenkins. (Id.).

## II. <u>Discussion</u>

### A. Municipal Liability under 42 USC § 1983

Section 1983 creates a federal cause of action against state or local officials who deprive a person of a federal right while acting under the color of state law. 42 U.S.C. § 1983.  To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom. <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 694 (1978); <u>Thomas v. City of Chattanooga</u>, 398 F.3d 426, 429 (6th Cir. 2005).  A plaintiff can prove the existence of a municipality's illegal policy or custom by looking to: 1) the municipality's legislative enactments or official agency policies; 2) actions taken by officials with final decision-making authority; 3) a policy of inadequate training or supervision; or 4) a custom of tolerance or acquiescence of federal rights violations. <u>Id</u>.  Further, municipal liability may be imposed for a single decision by a municipal policymaker where the decision-maker "possesses final authority to establish municipal policy with respect to the action." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 482 (1986).  Whether a decision-maker has the authority to make municipal policy is a question of state law which may be evidenced by a legislative enactment granting such authority or the delegation of the authority by an official who possesses it. <u>Id</u>. at 482-483; <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 124 (1988).

Here, Mayor Yassney  has final decision-making authority with regard to the appointment and removal of all city employees.  Under Kentucky law, the "mayor shall be the appointing authority with power to appoint and remove all city employees...except as tenure and terms of employment are protected

7

by statute, ordinance or contract and except for employees of the council." K.R.S. § 83A.130(9). Kentucky law further provides that the "executive authority of the city shall be vested in the mayor" and that city officers "may be removed by the executive authority at will unless otherwise provided by statute or ordinance..." K.R.S. § 83A.130(3); K.R.S. § 83A.080(3).   Further, according to the City of Russellville's  Policies and Procedures Manual, the "final and formal discharge of an employee shall be the responsibility of the mayor." Part III, Paragraph E(3)(d)(2).  Thus, it seems clear that when Mayor Yassney terminated Jenkins, she was acting with the final decision-making authority granted to her by state law, and, thus, her decision constituted official municipal policy which may give rise to municipal liability under §1983.  Cf. Worsham v. City of Pasadena, 881 F.2d. 1336, 1340-1341 (5th Cir. 1989) (existence of council with authority to review and set aside mayor's decision to terminate municipal employee precluded finding that mayor possessed final city policy-making authority over employee's termination).

**(1) Procedural Due Process**

As part of her § 1983 claim, the Plaintiff contends that she was denied procedural due process under the Fourteenth Amendment when the Defendants terminated her without a pre-termination hearing. (DN 6, Amended Complaint, ¶ 9).  The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law..." U.S. Const., Amend. XIV, § 1.  The Sixth Circuit has held that a court should undertake a two-step analysis when considering claims for the violation of due process rights. Mitchell v. Fankhauser, 375 F.3d  477, 480 (6th Cir. 2004).  First, the court must determine whether the Plaintiff has a "life, liberty, or property" interest entitled to due process protection. Id.  Second, if the court finds that the Plaintiff has a protected interest, it must then determine what process is due.  Id.

To prevail on her due process claim, then, the Plaintiff must have a property interest in continued employment with the City.  If the Plaintiff does not have a property interest in her position, then she is not entitled to any pre-deprivation process. See, e.g., Curby v. Archon, 216 F.3d 549, 553 (6th Cir. 2000).  "A property interest exists and its boundaries are defined by 'rules or understandings that stem from an independent source such as state law-- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" Id. (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)). Thus, to determine whether the Plaintiff had a property interest in continued employment with the City, the Court must look to Kentucky law.

Under Kentucky law, certain employees enjoy property interests in their positions by statutory grant.  However, the Kentucky statute specifically concerning the employment status of non-elected officials, including the city clerk, provides that non-elected officers "may be removed by the executive authority at will unless otherwise provided by statute or ordinance..." K.R.S. 83A.080(2)-(3); see also K.R.S. § 83A.130(9).  There is no evidence to suggest that  the City of Russellville has enacted any ordinance which would modify the at-will status of non-elected officers. There is, however, a Kentucky statute which provides, in part, that "(n)o employee shall be...discharged...for filing and pursuing a lawful [workers' compensation] claim..."  K.R.S. 342.197(1).  Here, the Plaintiff seems to contend that her "property interest" in employment with the City is derived from this statute, which was codified following a Kentucky Supreme Court decision recognizing that allowing an employee to be terminated for filing a workers' compensation claim would be contrary to public policy. See Firestone Textile Company Division v. Meadows, 666 S.W.2d 730 (Ky. 1983).  However, the Court finds no authority to conclude that this type of statute, which was enacted to achieve the specific and narrow purpose of protecting employees that seek workers' compensation benefits from retaliation by their employers, vests an employee in an otherwise

9

at-will employment relationship with a constitutionally-protected "property interest" in continued employment.[1]

Absent the creation of property interest in employment by statute, a plaintiff may show that a property interest in employment was conferred by contract.  However, the Plaintiff does not allege that her employment with the City, and, thus her property interest, stemmed from an express or implied contract.

The Court, therefore, holds that the Plaintiff had no property interest in her continued employment with the City that would have entitled her to the due process protections of the Fourteenth Amendment. The Defendants' motion for summary judgment as the Plaintiff's procedural due process claims is **GRANTED**.

**(2) Substantive Due Process**

The Plaintiff also seems to argue that the City violated her substantive due process rights by terminating her in retaliation for filing a workers' compensation claim. (DN 6, Amended Complaint, Count II).  The Fourteenth Amendment has a substantive due process component that "protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." <u>Young v. Twp. of Green Oak</u>, 471 F.3d 674, 684 (6th Cir. 2006) (<u>quoting</u> <u>Sutton v. Cleveland Bd. of Educ.</u>, 958 F.2d 1339, 1350 (6th Cir. 1992).  However, "absent the infringement

---

[1]The Eighth Circuit has twice discussed whether a judicially-created public policy exception (that has not become part of a state's statutory code) can create a constitutionally-protected property interest in employment, but has seemingly reached no conclusion. <u>Allen v. City of Pocahontas</u>, 340 F.3d 551, 555 (8th Cir. 2004) (declining to decide whether the public policy exception to Arkansas's at-will employment doctrine created a "property interest" protected by the Fourteenth Amendment's guarantee of due process); <u>but</u> <u>see</u> <u>Bennett v.Watters</u>, 260 F.3d 925, 929 (8th Cir. 2001)(holding that the right not to be discharged in violation of Arkansas's public policy is not a property interest for procedural due process purposes).  Three federal district courts  have similarly held that a state public policy exception to the at-will employment does not create a property interest in employment. <u>Beck v. City of Durham</u>, 129 F. Supp.2d. 844, 850-851 (M.D.N.C. 2000); <u>Hughes v. Bedsole</u>, 913 F.Supp. 420, 429-430 (E.D.N.C. 1995); <u>Reitz v. Persing</u>, 831 F.Supp. 410, (M.D. Penn. 1993*).*

Case 1:05-cv-00024-JHM-ERG   Document 84   Filed 07/19/07   Page 11 of 18 PageID #: 2405

of some 'fundamental right'...the termination of public employment does not constitute a denial of substantive due process." Id.  "[A]reas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the Constitution.'" Id. (quoting McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 229, (1985) (Powell, J., concurring).[2]

Thus, because the Plaintiff has alleged only the infringement of a right to employment - and not some fundamental right created by the Constitution - the Court holds that her substantive due process claim fails as a matter of law.  Accordingly, the Defendants' motion for summary judgment as to the Plaintiff's substantive due process claim is **GRANTED**.

Finally, because the Court finds that the Plaintiff's claims brought pursuant to § 1983 fail for other reasons, the Court declines to consider the parties' arguments regarding the exhaustion of state law remedies. However, because the Plaintiff's substantive due process claim could essentially be brought as a pendent state law claim for wrongful discharge, and because both parties have briefed the merits of a wrongful discharge claim, the Court will consider whether the Plaintiff has established such a claim.

**B. Wrongful Discharge/Retaliation**

Kentucky courts apply a modified version of the McDonnell Douglas burden-shifting scheme to retaliation claims. Kentucky Ctr. For Arts v. Handley, 827 S.W.2d 697, 701 (Ky. Ct. App. 1991) (relying on McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Accordingly, a plaintiff, in making out a prima facie case, must show that 1) she engaged in a protected activity; 2) she was disadvantaged by an

---

[2]For example, the Sixth Circuit has specifically held that not even an employee's state law right to be discharged only "for cause" enjoys substantive due process protections.

act of her employer; and 3) there is a causal connection between the activity engaged in and the employer's act. <u>Handley</u>, 827 S.W. 2d. at 701.  The third element of the test requires that the employee establish that her engagement in a protected activity was "a substantial and motivating factor but for which the employee would not have been discharged." <u>Henderson v. Ardco, Inc.</u>, 247 F.3d 645, 654 (6th Cir. 2001) (<u>quoting</u> <u>First Property Management Corp. v. Zarebidaki</u>, 867 S.W.2d 185, 188-189 (Ky. 1993).  If the Plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the decision.  The burden then shifts back to the employee to show that "but for" the protected activity, the adverse action would not have occurred. <u>Handley</u>, 827 S.W. at 701.

Here, both parties agree that in filing for and pursuing a workers' compensation claim, the Plaintiff was engaged in legally protected activity.[3]  Both parties also agree that the Plaintiff was disadvantaged when her employer, the City of Russelleville, terminated her.  What the parties dispute, however, is whether the Plaintiff's termination was connected to her decision to file for and pursue workers' compensation benefits. The Court finds that while Plaintiff has presented evidence that she *may* have been terminated for activities she engaged in while pursuing workers' compensation benefits - that is, allegedly receiving sick-pay from the City while on disability leave in violation of City policy-  the Plaintiff has presented *no* evidence which indicates that she was terminated *because* she filed for and pursued workers' compensation benefits.  While the evidence suggests that there may have been many motivating factors behind the Plaintiff's termination - including her tension-filled relationship with the Mayor, her failure to properly perform her duties as City Clerk (as reported by the City's auditors), and her alleged abuse of the City's sick-pay/disability leave policy- the evidence does not suggest that her decision to pursue workers'

---

[3]K.R.S. §342.197(1) states: "No employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim under this chapter." (Chapter 342 is the chapter of the Kentucky statutory code dealing with workers' compensation.)

compensation benefits was one of the motivating factors. Finally, even though the Plaintiff's termination followed shortly after her pursuit of workers' compensation benefits, "absent other evidence of retaliation, a temporal relation is insufficient to survive summary judgment." Contreras v. Suncast Corp., 237 F.3d 756, 765 (7th Cir. 2001).

Accordingly, the Court holds that the Plaintiff has not established a prima facie case of retaliation because she has not presented evidence that would allow a reasonable trier-of-fact to find that her pursuit of workers' compensation benefits was a substantial, motivating factor behind her termination. Thus, the Plaintiff's claim of wrongful discharge against the City fails as a matter of law.  The Defendants' motion for summary judgment as to this claim is **GRANTED**.

**C. Defamation**

The Plaintiff also alleges that she was defamed by the Defendants when 1) the Mayor accused the Plaintiff, in front of the city attorney, of instructing another employee to violate City policy and of committing workers' compensation fraud (for which the Mayor threatened arrest); 2) the Mayor told a local judge-executive  that the Plaintiff had issued several cold checks on behalf of the City which caused the City to be charged a large amount in service fees; and 3) the Mayor told the Plaintiff's subordinate that the Plaintiff was not performing her job properly.

Under Kentucky law, defamation consists of four elements: 1) a defamatory statement; 2) about the plaintiff; 3) that is published; and that 4) causes injury to reputation. Columbia  Sussex Corp. v. Hay, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981). Spoken defamatory words are called slander. As a general rule, words are only actionable *per se* (meaning damages are presumed and the person defamed may recover without allegation or proof of special damages) where the words charge or impute: 1) the commission of a crime involving moral turpitude; 2) affliction with an infectious disease likely to exclude the accused

13

from society; 3) unfitness to perform the duties of an office, occupation, or employment, or having a tendency to prejudice a person in his trade, calling, or profession; or 4) acts which might tend to disinherit the person charged." <u>Hill v. Evans</u>, 258 S.W.2d 917, 918 (Ky. Ct. App. 1953).

Here, the first element of defamation is met since "defamatory language" consists of any language that "tends to harm the reputation of another so as to lower [her] in the estimation of the community or to deter third persons from associating or dealing with him." <u>Stringer v. Wal-Mart Stores, Inc.</u>, 151 S.W.3d 781, 793 (Ky. 2004). (<u>quoting</u> Restatement (Second) of Torts § 559 (1977)). The second and third elements of the tort are met since the evidence shows that the words were about Plaintiff and spoken to others.  As to the last element, because the allegedly defamatory words here relate to the unfitness of the Plaintiff to perform her professional duties and have a tendency to prejudice the Plaintiff in her profession, the alleged words are slander per se. Words that are slanderous per se are presumed by law actually and necessarily to damage the person about whom they are spoken. <u>Elkins v. Roberts</u>, 242 S.W.2d 994 (Ky. 1951)(<u>cited</u> <u>by</u> <u>Stringer</u>,1 51 S.W.3d at 794). Thus, the fourth element of defamation - injury to reputation- is presumed.

Truth is generally a complete defense to an action for defamation, even if the words "may have been inspired by malice or ill will,..." <u>Bell v. Courier-Journal & Louisville Times Co.</u>, 402 S.W. 2d 84, 87 (Ky. Ct. App. 1966). However,  the defendant must prove truth as an affirmative defense by a preponderance of the evidence. <u>Stringer</u> at 795 (<u>quoting</u> David A. Elder, Kentucky Tort Law: Defamation and the Right of Privacy,  §1.10(A) at 133-135).

Kentucky courts have also recognized a qualified privilege for defamatory statements where the alleged defamatory "communication is one in which the party has an interest and it is made to another having a corresponding interest..."<u>Stringer</u> at 796.  Importantly, however, this privilege only exists if the

14

communication "was made in good faith and without actual malice." <u>Id</u>. So, although Kentucky courts have expressly recognized a qualified privilege for defamatory statements relating to the conduct of employees, false and defamatory statements uttered in this context will still give rise to a cause of action for defamation if they were "maliciously uttered." <u>Id</u>. (quoting <u>Stewart v. Williams</u>, 218 S.W.2d 948 706 (Ky. 1949). Indeed, where the circumstances suggest that a qualified privilege may exist, "when... there is any evidence of actual malice or malice in fact, the case should go to the jury." <u>Id</u>. at 799 (quoting <u>Tanner v. Stevenson</u>, 128 S.W. 878, 882 (Ky. Ct. App. 1910). Actual malice "requires a showing of knowledge of falsity of the defamatory statement or reckless disregard of its truth or falsity." <u>Id</u>. (quoting <u>McCall v. Courier-Journal & Louisville Times Co.</u>, 623 S.W.2d 882, 885 (Ky. 1981). Malice in fact exists where "malice may be inferred from the fact of...falsity." <u>Id</u>. (citing <u>Thompson v. Bridges</u>, 273 S.W. 529, 531 (Ky. Ct. App. 1925)).

Here, the Court concludes that there are material facts in dispute concerning whether any of the Mayor's defamatory statements about the Plaintiff were based in truth. The parties have presented conflicting evidence concerning both the quality of the Plaintiff's work and the legality of the process through which the Plaintiff received sick-pay while on disability leave. Further, although the Mayor's defamatory comments may have been spoken in the employment context, and thus potentially qualify as privileged, a reasonable jury could find that not only were the Mayor's statements not based in truth, but that they were uttered with malice - that is, without regard for whether her statements were true or false. For these reasons, the Defendants' motion for summary judgment as to the Plaintiff's defamation claim is **DENIED**.

## D. Intentional Infliction of Emotional Distress/ Tort of Outrage

The Plaintiff also alleges that Mayor Yassney, in her individual capacity, committed the tort of

15

outrage,  by intentionally and recklessly creating "an atmosphere intimidation and hostility  in the workplace." To support her claim,  the Plaintiff has presented evidence that the Mayor repeatedly told City Hall workers that she wanted the Plaintiff terminated; unreasonably interfered with the Plaintiff's work; installed a security camera in the Plaintiff's office so she could watch the Plaintiff's daily activities (which the Mayor maintains was installed for security purposes); falsely accused the Plaintiff of fraud; and threatened her with arrest. Further, the Plaintiff claims that because of this extreme and outrageous conduct, the Plaintiff has suffered severe emotional and psychological stress which has resulted in depression,  ulcers, and sleep problems.

In Kentucky, one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. Stringer, 151 S.W.3d at 788 (Ky. 2004).  A prima facie case of intentional infliction of emotional distress/outrage requires that 1) the wrongdoer's conduct must be intentional or reckless; 2) the conduct must be so outrageous and intolerable that it offends against the generally accepted standards of decency and morality; 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and 4) the emotional distress must be severe. Id.  In considering this tort, the Kentucky Supreme Court has recognized that it is "not enough that the defendant has acted with an intent which is tortious, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice'... Liability has been found only where the conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Humana of Kentucky, Inc. v. Seitz, 796 S.W.2d 1, 3 (Ky. 1990)(quoting Restatement (Second) of Torts, § 46, Comment d).

Here, when viewed in the light most favorable to the Plaintiff, the evidence does not establish that

the Mayor's conduct was so outrageous and atrocious as to go beyond "all possible bounds of human decency" and be "utterly intolerable in a civilized society." Thus, the Defendants' motion for summary judgment as to the tort of outrage is **GRANTED**.

**E. Mayer Yassney in her Individual Capacity**

Because the Court holds that Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims except for the state law claim of defamation, the Court must look to Kentucky law to determine to what extent Mayor Yassney - a municipal official- may be held liable in her individual capacity for the tort of defamation.

The Defendants argue that the claims asserted against Mayor Yassney in her individual capacity must fail because the Plaintiff has only proffered evidence which relates to the performance Yassney in her official capacity as mayor. However, it is a well-established principle of Kentucky law that a state officer or employee is liable "for deliberate wrongdoing, regardless of whether he was acting within the scope of his authority." Minger v. Green, 239 F.3d 793, 797 (6th Cir. 2001) (quoting Carr v. Wright, 423 S.W.2d 521, 522 (Ky. 1968). This is based on the premise that, while a government official or employee may be entitled to official immunity for actions authorized by law, when a government or employee "exceeds, ignores, or disregards the limits set to his authority, he cannot then justify his act at all, but must respond to the party injured like any other wrongdoer." Minger, 239 F.3d at 797 (quoting Upchurch v. Clinton County, 330 S.W. 2d. 428, 431 (Ky. 1959). Therefore, "a state officer or employee is not immune from suit under Kentucky law when the individual knowingly commits an intentional tort, wrongful act, or other form of deliberate wrongdoing." Id.

Thus, because the defamation is generally regarded as an intentional tort, the Court holds that

Mayor Yassney may be held liable  in her individual capacity for her alleged commission of that tort.[4]

### IV. <u>Conclusion</u>

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.

cc: Counsel of Record

---

[4]A Kentucky court has called defamation a "quasi-intentional tort." <u>Columbia Sussex Corp. v. Hay</u>, 627 S.W.2d 270, 273 (Ky. Ct. App.  1981).

18